FORREST M. BLUE AND SHIRLEY N. BLUE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Blue v. Commissioner
Docket No. 22587-80.
United States Tax Court
T.C. Memo 1982-486; 1982 Tax Ct. Memo LEXIS 258; 44 T.C.M. (CCH) 927; T.C.M. (RIA) 82486; August 24, 1982. Frank E. Clohan, for the petitioners. Charlotte Mitchell, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income *259 taxes for 1977 and 1978 in the amounts of $2,724 and $2,271, respectively. The sole issue for decision is whether, under section 162(a)(2), [1] petitioners are entitled to deduct certain expenses incurred in or in the vicinity of Baltimore, Maryland, in 1977 and 1978. The deductibility of such expenses depends upon resolution of two factual questions: 1. Whether petitioner was "away from home" within the meaning of section 162(a)(2) when he incurred the disputed expenses; and 2. Whether petitioner's employment in Baltimore was "temporary" in 1977 and 1978. FINDINGS OF FACT When they filed their petition, petitioners Forrest M. Blue and Shirley N. Blue, husband and wife, were legal residents of Sacramento, California. They filed joint Federal income tax returns for 1977 and 1978 with the Internal Revenue Service, Fresno, California. 1. Petitioner's football career.
Petitioner Forrest M. Blue (petitioner) was employed as a professional football player from September 1968 through February 1, 1979. An All-American football *260 player during his college years at Auburn University, he was picked in the first round of the National Football League draft by the San Francisco Forty-Niners football team (the 49ers) for the 1968 season. Playing as the 49ers' center, he was named to the All-Pro team for 4 consecutive years--1971 through 1974. In December 1974, petitioner entered into a series of three 1-year standard National Football League (NFL) contracts with the 49ers, covering the 1975, 1976, and 1977 football seasons [2] at base salaries of $60,000, $66,000, and $71,500, respectively. Executing these contracts was consistent with the standard practice for NFL teams to bind their players to a series of 1-year contracts, which are identical in terms (except for salary). If a player under contract is traded, the new team is required to accept the terms of the remaining contracts. During the first week of the training camp for the 1975 season, petitioner suffered a partial tear of a ligament in his right knee. This injury caused petitioner to miss most of the *261 pre-season training and exhibition games, and, in the last exhibition game, he reinjured his knee. In addition, throughout his career, he was plagued by a recurring back injury first sustained in high school. The 49ers' team doctor, however, stated that petitioner was physically able to play football in 1975. Before the start of the regular 1975 season, petitioner was traded to the Baltimore Colts football team (the Colts). The three contracts entered into with the 49ers were assigned to the Colts. The colts already had a center, and, because the pre-season training period was over, their team was basically set for the season. Petitioner, however, was assured by Joe Thomas, the Colts' general manager, that he would be an "integral part" of the Colts' team, and he accepted the trade. [3]
*262 Petitioner was employed by the Colts for four seasons, the three for which the contracts ran and a fourth in which the Colts exercised their contract option to retain him at a salary increase of 10 percent. His employment by the Colts required him to be available to the team approximately 5-1/2 months each year, from mid-July, when he reported to the Colts' training camp, through roughly mid-to-late-December (depending on the Colts' playoff status). In 1977, petitioner spent roughly 200 days in California, 18 days traveling with the Colts for away-from-Baltimore games, and the remaining 147 days in the Baltimore area (52 days of which were spent in training camp in the Baltimore area). In 1978, he spent 220 days in California, 16 days traveling for away-from-Baltimore games, and 129 days in the Baltimore area. Petitioner played infrequently with the Colts. He was assigned to the special teams and was used mainly to snap for punts. Petitioner's total time on the field for the four seasons he spent with the Colts was approximately 8 to 20 minutes each season. During 1975, the Colts were in the Eastern Division playoffs and Coach Ted Marchiboda was named by certain groups as *263 "Coach of the Year." The Colts won the Eastern Division in 1979 and 1977. Petitioner received $41,857 in compensation from the Colts in 1977 and $91,066 in 1978; some of the latter increase was due to deferred bonuses and playoff benefits. 2. Petitioner's off-season employment.
Throughout his football career, petitioner concerned himself with establishing a means of livelihood that would provide employment following completion of his football career. In his first years with the 49ers, he attended law school at the University of Florida in Gainesville, Florida, during the off-season, renting a residence in San Francisco during the football season. In early 1972, petitioner abandoned his law school studies and accepted a position during the off-season with a real estate developer and toy company executive, Ron Watkins (Watkins), who lived in Sacramento, California. To learn Watkins' businesses, petitioner moved his personal residence to Sacramento in 1972. This business connection ended in early 1974 after Watkins suffered a heart attack. In March 1974, petitioner bought a 5-percent interest in Vega Manufacturing (Vega) which was engaged in manufacturing electronic equipment. *264 In lieu of a cash salary, petitioner received stock for his employment services. After learning the business in depth, petitioner hoped to run Vega. One advantage of the Vega job was its proximity to San Francisco, where the 49ers were located and held practice. In 1974, petitioner and his wife purchased a residence in Los Altos Hills, California, which is in the San Francisco Bay Area. Petitioner's career with Vega ended near the close of 1975, when Vega filed a petition for reorganization in bankruptcy and, in March or April 1976, filed a petition for liquidation in bankruptcy. While working with Watkins between 1972 and 1974, petitioner invested in two real estate construction projects, a strip shopping center in Sacramento and an apartment building. Petitioner and his wife continued to own the shopping center in 1977 and 1978, receiving gross rentals of $42,867 and $44,920 before expenses; after deductions, including depreciation in the respective amounts of $11,106 and $11,664, the shopping center project produced net income of $5,227 in 1977 and a loss of $3,732 in 1978. Petitioner paid commissions in 1977 and 1978 to brokers for obtaining tenants for the shopping center *265 and paid management fees to a friend in Sacramento for collecting rents. He personally participated in leasing arrangements and in decisions about upkeep. In about mid-1976, petitioner enrolled in a real estate license school, obtaining a California real estate license in June 1977. He then became associated with a real estate broker in Palo Alto. This association did not entail the day-to-day business of selling residential property; rather, petitioner hoped to use his license as a real estate developer. In 1977 and 1978, petitioner involved himself in three different real estate projects. First, sometime in the spring of 1977, petitioner purchased a house in Atherton, California, planning to renovate and resell it at a sizable profit. Petitioner himself did most of the renovation, working 8 hours a day for approximately 3 months. He eventually sold the house in October 1977, making a profit of $8,769, far less than he had hoped. Second, in 1977, petitioner was offered a $50,000 fee for finding a purchaser of a country club in Los Altos Hills. His long-term goal was to operate the club, own part of it, and conduct real estate transactions out of the club. He had not *266 been successful in finding a purchaser for the club by the date the Colts' training camp opened in 1978. During late 1977 and early 1978, petitioner worked on a third project which involved locating a site for a Victoria Station restaurant. This project had fallen through prior to the 1978 opening of the Colts' training camp. During his 1976, 1977, and 1978 seasons with the Colts, petitioner's wife and two daughters joined him in Baltimore after the exhibition games ended, living in a rented residence from September through the end of the football season in December. They returned to their residence in Los Altos Hills for the off-season. Petitioner's two daughters thus attended school in the fall in Baltimore and after Christmas in California. Petitioner's mother-in-law, Nadine Smith, also one of petitioner's dependents, resided with petitioner's family in California; she moved with petitioner's family to Baltimore for most of the football season. During this time, petitioner's wife was not employed outside the home. On his 1977 and 1978 income tax returns, petitioner claimed $7,177 and $7,001, respectively, as business expense deductions. These sums include amounts expended *267 for gasoline, food, lodging, transportation, and other items paid or incurred in and around Baltimore. Of these amounts, respondent allowed $167 for 1977 and $329.01 for 1978, respectively. The sums so allowed as deductions represented amounts (in excess of reimbursement) spent by petitioner for meals while traveling away from Baltimore with the Colts, and other ordinary and necessary expenses incurred in the pursuit of his profession as a football player. OPINION Section 162(a)(2) permits a deduction for ordinary and necessary "traveling expenses (including amounts expended for meals and lodging * * *) while away from home in the pursuit of a trade or business." Such expenses must be (1) ordinary and necessary; (2) incurred while petitioner was "away from home"; and (3) incurred in the pursuit of a trade or business. Commissioner v. Flowers,326 U.S. 465 (1946). Because we find that, in 1977 and 1978, Baltimore was petitioner's "tax home," and the only documented expenses were incurred in the vicinity of Baltimore, the deductions must be denied.We also hold that petitioner's employment in Baltimore was "indefinite" rather than "temporary" so that the disputed *268 deductions do not fall within the exception applicable to temporary employment. See, e.g., Peurifoy v. Commissioner,358 U.S. 59 (1958); Kroll v. Commissioner,49 T.C. 557 (1968). 1. "Tax Home"
The Court of Appeals for the Ninth Circuit, to which appeal in this case would lie, has defined a "tax home" of a taxpayer as "his abode at his principal place of business or employment." Coombs v. Commissioner,608 F.2d 1269, 1274 (9th Cir. 1979), affg. in part and revg. and remg. in part 67 T.C. 426 (1976); Folkman v. United States,615 F.2d 493, 495 (9th Cir. 1980). "[W]here one's 'home' is for tax purposes is essentially a question of fact." Frank v. United States,577 F.2d 93, 97 (9th Cir. 1978); Coombs v. Commissioner,supra at 1274. Petitioner argues that his principal place of business was California; respondent contends that petitioner's activities in California did not constitute a business and that, even if they did, they were secondary to his principal employment in Baltimore. Assuming, arguendo, that petitioner's California real estate and shopping *269 center concerns constituted a business, we agree with respondent that Baltimore was petitioner's principal place of business and hence his "tax home" during the years in question. When "a taxpayer both earns substantial income and stays overnight in each of two locations, the determination of which is the 'principal place of employment' may become difficult." Folkman v. United States,supra at 495. Recognizing this difficulty, the courts have adopted a three-part definitional test to ascertain a taxpayer's "tax home." Folkman v. United States,supra at 495; Markey v. Commissioner,490 F.2d 1249, 1255 (6th Cir. 1974), revg. and remg. a Memorandum Opinion of this Court; Montgomery v. Commissioner,64 T.C. 175, 179 (1975), affd. 532 F.2d 1088 (6th Cir. 1976). This test relies on objective rather than subjective factors, and specifically considers the following: (1) The length of time that taxpayer spent in [the two locations]; (2) the degree of taxpayer's business activity in each place; and (3) the relative proportion of taxpayer's income derived from each place.
Folkman v. United States,supra at 496. *270 During the years in question, petitioner spent somewhat more time in California than in Baltimore: In 1977, he spent approximately 200 days in California and 147 days in the Baltimore area (with an additional 18 days spent on the road with the Colts); in 1978, he spent 220 days in California and 129 days in the Baltimore area (with 16 days on the road). The evidence is sketchy on the second factor, the degree of business activity in each place, insofar as it relates to petitioner's California employment. [4] Petitioner's employment with the Colts required his presence in Baltimore for 5 to 5-1/2 months a year. Despite his limited playing time, the business of being a professional football player absorbed his full time in Baltimore. [5] How much time he spent in business [6] activities in California is uncertain. In 1977, petitioner testified that renovating the Atherton house for resale consumed 3 months, 8 hours a day. The record does not show the amount of time he spent on the shopping center. In late 1977 and 1978, petitioner testified that he spent "a lot" of time trying to locate a purchaser for the country club, and "considerable time" working on the Victoria Station project. *271 We do not think the evidence would warrant a finding that these activities equalled a 6-day work week for 5 to 5-1/2 months. The second factor of the three-part test thus weighs against petitioner. The third factor indicates strongly that Baltimore was petitioner's principal place of business. Petitioner derived a far greater proportion of his income from his Colts' employment *272 than from his California business activities. In 1977, the Colts paid him $41,857, while he earned $5,227 (net) from his shopping center and $8,769 from selling the Atherton house, or a total of $13,996 from his California projects. In 1978, the comparison is more striking: The Colts paid him $91,066 while the shopping center showed a loss of $3,732. [7]
In summary, petitioner spent somewhat more time in California than in Baltimore, but was more consistently engaged in business in Baltimore than in California, and he gained the far greater share of his livelihood from his Baltimore employment. Under the three-part objective test expounded *273 in the Folkman,Markey, and Montgomery cases, supra, we find that Baltimore was petitioner's tax home in 1977 and 1978. See also Wills v. Commissioner,48 T.C. 308, 312-313 (1967), affd. 411 F.2d 537 (9th Cir. 1969) (a professional baseball player); Gardin v. Commissioner,64 T.C. 1079, 1085 (1975) (a professional football player); Stemkowski v. Commissioner,76 T.C. 252, 303-306 (1981), on appeal 2d Cir. and 4th Cir. (1981) (professional hockey players). Our finding that Baltimore was petitioner's tax home requires rejection of his argument that he is entitled to the disputed deductions, for it is stipulated that the expenses in controversy were incurred in the vicinity of Baltimore. Hence, petitioner was not "away from home" when he incurred them. [8]
*274 2. "Temporary" v. "Indefinite" Employment
Petitioner's second argument, that the expenses are deductible because his employment with the Colts in 1977 and 1978 was "temporary," is likewise unpersuasive. If employment is "temporary" as opposed to "indefinite," some related expenses, which would otherwise be treated as personal expenditures, are deductible because they are considered to arise from the exigencies of business and not from the taxpayer's personal choice to live a distance from his work. Peurifoy v. Commissioner,supra;Norwood v. Commissioner,66 T.C. 467, 469 (1976). Petitioner seeks to bring his Baltimore expenses within this rule. Employment is considered temporary if it "can be expected to last for only a short period of time," Tucker v. Commissioner,55 T.C. 783, 786 (1971), or in the words of the Court of Appeals for the Ninth Circuit, to which this case is subject to appeal, if there was a reasonable probability known to the taxpayer that the employment would be "substantially short." Wright v. Hartsell,305 F.2d 221, 224, fn. 1 (9th Cir. 1962); Harvey v. Commissioner,283 F.2d 491, 495 (9th Cir. 1960), *275 revg. and remg. 32 T.C. 1368 (1959). Even if it is known that a particular job may or will end at some future date, that job is not temporary if it is expected to last for a "substantially long" or indefinite period of time. See Norwood v. Commissioner,supra at 469; Jones v. Commissioner,54 T.C. 734, 740 (1970), affd. 444 F.2d 508 (5th Cir. 1971); see also Wright v. Hartsell,supra at 224, fn. 1; Harvey v. Commissioner,supra. The burden of proving that his employment was temporary rests with petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In general, the temporary or indefinite nature of employment is judged at the beginning of the employment. [9]Commissioner v. Peurifoy,254 F.2d 483, 486 (4th Cir. 1957), affd. per curiam 358 U.S. 59 (1958); Gardin v. Commissioner,supra at 1084. If a taxpayer can expect to be employed at a new location for an indefinite or "substantially long" period, it is not unreasonable to expect him to move his personal *276 abode to the new location. Kroll v. Commissioner,49 T.C. 557, 562 (1968); Wright v. Hartsell,supra.
We think that when petitioner left California for Baltimore in 1975, his new job with the Colts was reasonably expected to last for an indefinite period. We recognize that his future was not assured because of his injury, the timing of his trade, and the fact that the Colts already had a center. At that time, however, he was a 4-year All-Pro center, his injury was found by a physician to be mending, his contracts were scheduled to last 3 more years, and he was assured by general manager Joe Thomas that he would be an integral part of the team. Moreover, we infer from the fact that the Colts, a team with some exceptionally fine coaching in 1975, willingly traded for him that they intended to use him for some significant amount of time. Given all of these facts, we do not think that petitioner's employment with the Colts had such *277 a "degree of impermanence" when he was traded or in the ensuing years as to make his employment with that team temporary. See Gardin v. Commissioner,supra at 1084. The fact that his Colts' employment seemed likely to end, at least in 1978, does not transform an indefinite job into a temporary one. Even "permanent" jobs usually end at predictable dates--for example, at mandatory retirement, at the end of a contract, or on completion of a construction project. But this does not render them temporary within the meaning of the court-made exceptions. If the taxpayer has incurred duplicate expenses while holding an indefinite job, such costs are attributable to personal preference and not to business exigencies. See Wills v. Commissioner,48 T.C. 308, 312 (1967), affd. 411 F.2d 537 (9th Cir. 1969); Tucker v. Commissioner,55 T.C. 783, 786 (1971).We hold, therefore, that petitioner's employment in Baltimore in 1977 and 1978 was indefinite, and that the claimed expenses must be denied. Due to concessions, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect in the tax years in issue, unless otherwise indicated.↩
2. The contract for the 1975 season ran from May 1, 1975 through Apr. 30, 1976; the successive contracts also ran from May 1 through April 30.↩
3. A football player under a standard contract who is traded has two options: To accept employment with the new team according to the contract terms or to resign from NFL football. A football team has three or more options for a player under contract: To abide by the contracted terms, to trade the player, or to put him on "waivers" whereby the player is free to negotiate with any team in the NFL.↩
4. In Folkman v. United States,615 F.2d 493 (9th Cir. 1980), the Court evaluated this factor in terms of the number of working days spent in each place and included days spent away from the taxpayers' duty station in the course of business. 615 F.2d at 496, fn. 11, and 494, fns. 2, 4↩. 5. When employed by the 49ers, petitioner testified that he often went to Sacramento after the Sunday football games and stayed there on Monday "which was our day off." If the Colts' schedule resembled the 49ers', petitioner usually worked a 6-day week during his months in Baltimore. ↩
6. We use the term "business" for convenience and do not imply that we accept petitioner's argument that his California projects constituted businesses within the meaning of sec. 162 as opposed to investments.↩
7. On brief, respondent suggests that it may be appropriate to add back to the gross income the depreciation in assessing petitioner's profits from California enterprises. Should we do so, the figures would read $25,102 in 1977 ($13,996 plus depreciation of $11,106) and $7,932 in 1978 ($11,664 minus reported loss of $3,732). While the divergence is less pronounced, particularly in 1977, we still think the disparity sufficiently large that the third factor greatly favors a finding that Baltimore was petitioner's principal place of employment.↩
8. In their trial memorandum, petitioners state that, if they do not qualify for deductions of their Baltimore expenses, they are entitled to deduct expenses related to their California business activities under sec. 162 or sec. 212. However, they failed to offer evidence as to the fact or amount of such expenses. We treat this alternative argument, if properly before the Court, as abandoned. As to the evidence needed, see sec. 274(d).↩
9. Employment which commences as temporary may become indefinite as it develops. Commissioner v. Peurifoy,254 F.2d 483, 486 (4th Cir. 1957), affd. per curiam 358 U.S. 59↩ (1958).